# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2014 Session

## CYNTOIA DENISE BROWN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-A-215     J. Randall Wyatt, Jr., Judge**

---

**No. M2013-00825-CCA-R3-PC - Filed November 6, 2014**

---

The Petitioner, Cyntoia Denise Brown, appeals the Davidson County Criminal Court's denial of her petition for post-conviction relief from her convictions of first degree premeditated murder, first degree felony murder, and especially aggravated robbery and resulting concurrent sentences of life and eight years. On appeal, the Petitioner contends that she received the ineffective assistance of counsel, that she is "entitled to relief under error coram nobis," that her mandatory life sentence is unconstitutional, and that she was denied due process. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. JERRY L. SMITH, J., not participating.

Charles W. Bone, Nashville, Tennessee; J. Houston Gordon, Covington, Tennessee; Lyle Reid, Covington, Tennessee; Paul J. Bruno, Nashville, Tennessee; and Joe G. Riley, Ridgely, Tennessee, for the appellant, Cyntoia Denise Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

We glean the following relevant facts from this court's direct appeal opinion of the

Petitioner's convictions: On the evening of August 7, 2004, police officers from the Metropolitan Nashville Police Department responded to a 911 call and found the body of the victim, Johnny Allen, in a bedroom of his home. State v. Cyntoia Denise Brown, No. M2007-00427-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 301, at *4 (Nashville, Apr. 20 2009), perm. to appeal denied, (Tenn. 2009). The nude victim was lying face-down on the bed in a large pool of blood, and his "hands were beneath his face, his fingers 'kind of partially interlocked,'" as if he had been sleeping. Id. at **4, 15. An autopsy revealed that he had been shot in the back of the head and that he did not have any defensive wounds. Id. at **28-29. In the early morning hours of August 8, 2004, officers found the victim's white pickup truck in a Walmart parking lot and arrested the Petitioner at a nearby hotel. Id. at *6. At the time of Petitioner's arrest, she was sixteen years old and staying at the hotel with a man she referred to as "'Cut.'" Id. at **6, 8.

The Petitioner waived her Miranda rights and gave a statement to police in which she said that on the night of August 6, 2004, she was walking near a Sonic Drive-In when the victim, whom she did not know, picked her up in his truck. Id. He drove her to the Sonic, they ordered food, and the victim offered to let her spend the night at his home. Id. The Petitioner accepted the victim's offer, and they went to his house. Id. at *9. There, the victim showed the Petitioner some guns, and they got into bed together. Id. The victim whispered to and touched the Petitioner and reached underneath the bed. Id. The Petitioner thought the victim was reaching for a gun, so she pulled a .40 caliber handgun out of her purse and shot him. Id. at *10. She took money out of the victim's wallet and two of his guns, drove his truck to the Walmart parking lot, and had someone drive her to the hotel where she was later arrested. Id. The Petitioner denied that she was a prostitute or that she had sex with the victim. Id.

The Petitioner was tried as an adult, and the jury rejected her claim of self-defense, finding her guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery, a Class A felony. See id. at **34-35. The trial court merged the murder convictions and sentenced the Petitioner to life. Id. at *35. After a sentencing hearing, the trial court imposed a concurrent twenty-year sentence for the especially aggravated robbery conviction. Id. On appeal, this court affirmed the Petitioner's murder convictions but modified her conviction of especially aggravated robbery to aggravated robbery, a Class B felony, and remanded the case for sentencing as to that offense. Id. at *3. On remand, the trial court sentenced her to eight years and ordered that she serve the sentence concurrently with the life sentence.

After our supreme court denied the Petitioner's application for permission to appeal, she filed a timely pro se petition for post-conviction relief based, in pertinent part, on the denial of the effective assistance of counsel and newly discovered evidence "that Fetal

-2-

Alcohol Syndrome played a part in [her] actions on the night in question." The post-conviction court appointed counsel, and counsel filed an amended petition, maintaining that the Petitioner received the ineffective assistance of counsel and alleging that her life sentence was unconstitutional.

The record reflects that "counsel" and "co-counsel" represented the Petitioner at trial. At the post-conviction evidentiary hearing, counsel testified for the Petitioner that she and co-counsel began representing the Petitioner after the Petitioner's transfer hearing in juvenile court. The Petitioner had testified at the transfer hearing, and trial counsel reviewed tapes of the hearing. Counsel said that she and the Petitioner had many discussions about whether the Petitioner should testify at trial and that "there were parts of her [transfer hearing] testimony that were worrisome for us if they came out at trial." Counsel thought that if the Petitioner's trial testimony differed from her transfer hearing testimony, the State would be able to impeach her on cross-examination. Counsel stated, "I, apparently, was wrong, but I do recall having that conversation with her." Counsel said that there were other reasons why she did not want the Petitioner to testify but that she assumed that particular reason "played a factor" in the Petitioner's decision.

Counsel testified that the Petitioner had received a mental evaluation for juvenile court and that trial counsel had her re-evaluated. Counsel received three bankers boxes from the Petitioner's juvenile court attorney, and one of those boxes was full of the Petitioner's psychological and medical records. Counsel reviewed everything in the boxes and did not seek an expert in fetal alcohol spectrum disorder (FASD). Regarding the disorder, counsel stated, "I am sure I had heard of it. . . . I became much more familiar with it after Mr. [Dan] Birman found or interviewed some people."

On cross-examination, counsel testified that she became licensed to practice law in 1992 and that for the first sixteen years of her practice, including the Petitioner's 2006 trial, she practiced criminal law exclusively. Counsel estimated that at the time of the Petitioner's trial, she had tried fifty to sixty cases. The Petitioner had given a videotaped statement to police, and trial counsel filed a motion to suppress the statement. Trial counsel also gave Dr. William Bernet, a forensic psychiatrist from Vanderbilt University, the results of the Petitioner's previous mental evaluations. Dr. Bernet re-evaluated the Petitioner and testified at the suppression hearing about whether the Petitioner knowingly and intelligently waived her Miranda rights prior to giving her statement to police. Counsel said that in addition to the Petitioner's mental evaluation for suppression purposes, "I know we had to make sure she was competent so we certainly did an evaluation for competence. I am not sure if we went any further at that point on any other mental health issues." Counsel described the Petitioner as "brilliant" but said that "her personality was all over the place and you didn't know who you were going to be talking to from time-to-time, but it wasn't competency

-3-

issues, it was more like there was something wrong that we couldn't figure out what it was."

Counsel testified that she and co-counsel considered using a mental health defense but decided against it because "unless you have some sort of objective evidence to go with it such as a brain scan that showed damage or something that juries seem hesitant to really give a lot of weight to psychological testimony." Trial counsel also decided not to use a mental health defense because many of Dr. Bernet's opinions were based on "bad things" about the Petitioner that trial counsel did not want revealed to the jury. Counsel said that she did not remember Dr. Bernet's mentioning fetal alcohol syndrome (FAS), and she acknowledged that she would have "looked into" FAS if someone had mentioned the disorder.

Counsel testified that co-counsel was "one of the best lawyers in the State" and that they filed numerous pretrial motions in the Petitioner's case. They also examined the physical evidence and hired an investigator. Counsel said that the Petitioner's statement to police was "for the most part consistent" with her story to trial counsel and that "[t]here were some reasons to believe that her [self] defense was supported." Counsel and the Petitioner talked "quite a bit" about whether the Petitioner would testify at trial, and counsel thought the Petitioner's direct examination testimony would be "powerful." However, counsel was worried that the Petitioner would lose her temper on cross-examination because the Petitioner had lost her temper in meetings with trial counsel, had lost her temper with guards, and "had an inability at times to control her emotions." Counsel also considered how the State had cross-examined the Petitioner during the transfer hearing, that the State would cross-examine her at trial about her statement, and that the State would cross-examine her at trial about "some facts that were bad." At the juvenile transfer hearing, the Petitioner had testified that she took a shower after the shooting. Counsel was worried that if the Petitioner testified at trial, the Petitioner would not testify about the shower and that the State would impeach her. Counsel said the State "would have been able to cross-examine her rather effectively and that was part of what we weighed." The Petitioner never changed her basic version of the events, and co-counsel practiced cross-examination with her. However, practice "wasn't quite the same thing" as real cross-examination at trial. Counsel said her "impression was that [the Petitioner] relied on our advice" not to testify. Although the Petitioner did not testify at trial, the jury heard her self-defense claim through her statement to police.

On redirect examination, counsel acknowledged that if the Petitioner's transfer hearing testimony could not be used against her at trial, then counsel's concern about the testimony did not justify counsel's recommendation that the Petitioner not testify. Dr. Bernet had been involved with the Petitioner's case in juvenile court, so he was familiar with her. Counsel said that FAS "never crossed my radar" and that no one ever mentioned FAS until Dan Birman telephoned her after the Petitioner's trial. She explained,

-4-

So the entire time we represented Cyntoia it just seemed like something didn't make sense and, I mean, she is not the only client that that has happened with, so, but when Dan called me and had discovered this information and I saw the recording of this doctor, whose name I don't remember, talking about Fetal Alcohol Syndrome and what the symptoms are and what it causes in a person, it kind of in my mind made it all make sense.

On recross-examination, counsel acknowledged that Dr. Bernet was an expert in juvenile psychiatry and that he concluded the Petitioner suffered from disorders that interfered with her ability to make decisions and interfered with her relationships with people. In other words, he concluded that the Petitioner suffered from a personality disorder. Counsel said that if the Petitioner had been diagnosed with FASD, "we would have still analyzed . . . the cost benefit of admitting it versus not" because "usually there is baggage with any mental health . . . findings."

The Petitioner testified that she met with counsel and co-counsel in preparation for trial and that they planned to present a theory of self-defense. Trial counsel told the Petitioner that it was her decision whether to testify and that the judge would instruct the jurors that they could not hold her decision not to testify against her. The Petitioner said that she and trial counsel "talked about, um, the juvenile testimony coming in and that is why they didn't think it would be a good idea." The Petitioner and her family wanted her to testify, but she took trial counsel's advice because she trusted them. Counsel told the Petitioner not to make faces or have outbursts during the trial. The Petitioner said that counsel "probably looked at some issues that I had had before."

The Petitioner testified that if she had testified at trial, she would have stated the following: Months before she killed the victim, the Petitioner ran away from her adoptive parents' home. She was staying with different people in Nashville and using drugs and alcohol. In July 2004, she met "Cut Throat," who was twenty-four years old, and began using cocaine and staying in a hotel with him. At first, "Cut" was nice to her. However, he began verbally and physically abusing her. He also sexually assaulted her and made her prostitute herself. The Petitioner had to give the money she earned to Cut. She said that he was violent to her, that he almost killed her one time by choking her, and that she was scared of him.

The Petitioner testified that on the day of the victim's death, she was "pretty sure" she was using drugs because "[t]hat is all I ever did." She said, "Cocaine definitely, I probably smoked some weed too." The Petitioner left the hotel and started walking toward the Sonic. The victim stopped his truck and asked if she needed a ride and was hungry. The Petitioner

got into his truck, and the victim parked at the Sonic. He asked her if she was "up for any action," meaning he wanted to pay her for sex, and the Petitioner told him that she would have sex with him for $200. The victim offered to pay her $100, and they ultimately agreed that he would pay her $150. She said that the victim was "an old Caucasian man" and that she thought he was about fifty years old. However, he turned out to be "forty-something."

The Petitioner testified that the victim ordered food from the Sonic and that she told him about her family. The victim told her that he used to be in the military, that he was a sharp-shooter, and that he could "shoot the eye out of a piss ant." The victim drove the Petitioner to his home and offered her some wine. He tried to kiss her, but she pushed him away. The victim showed the Petitioner a gun and "was talking about all of these guns." He offered to let her take a shower. When the Petitioner got out of the shower, the victim was lying on the bed and was naked except for shiny "gold disco ball like boxers." The Petitioner, who was fully clothed, went downstairs with the victim to watch television. The Petitioner thought the victim was "weird." She was going to run, but a gun cabinet was in the room. The victim told the Petitioner that he wanted to make love to her and that he loved her. They went to his bedroom, and the Petitioner asked him if she could take a nap. The victim told her yes, so the Petitioner took off her skirt and pretended to sleep. The victim was touching the Petitioner and kept getting in and out of bed, and the Petitioner began to panic because she did not know what he was doing. The Petitioner thought the victim's behavior was odd. She said that the victim got back into bed, that he grabbed her "really hard," and that she thought he had figured out she was "faking to be asleep." She said that she saw him roll over "maybe to reach for something," that she thought he was "gonna get a gun or he is gonna do something to me," and that she "just . . . reacted." The Petitioner, who was lying on her stomach, "kinda raised up," reached over to the nightstand on her side of the bed, took a gun out of her purse, and fired the gun one time. She said that Cut had given her the gun to protect herself and that she had never fired it before she shot the victim.

The Petitioner testified that she thought the victim had gone to sleep and that he did not hear the gunshot. As she was fleeing his home, she realized that she did not get any money from him. She did not want to go back to Cut empty-handed, so she took some of the victim's guns. The Petitioner drove the victim's truck to the hotel and told Cut that she thought she had shot someone. He told her to drive the truck to the Walmart parking lot. The Petitioner drove the truck to the parking lot, and a man drove her back to the hotel. The next day, the Petitioner called 911. She said she did not go to the victim's house intending to rob or shoot him and that "[a]ll I wanted to do was leave."

On cross-examination, the Petitioner testified that she showered before she shot the victim, not after. Otherwise, the Petitioner thought counsel's evidentiary hearing testimony was accurate. She acknowledged that if trial counsel had presented a mental health expert

at trial, the State could have cross-examined the expert about the Petitioner's attempt to escape from Western Mental Health Institute (WMHI), her drug use, her asking someone after the shooting to take her back to the victim's house so she could take the rest of his property, her lengthy juvenile history, and her disciplinary issues at the juvenile detention center and jail. She also acknowledged that in a pretrial jailhouse telephone call to her adoptive mother, she told her mother that she "executed" the victim. The Petitioner had understood the charges against her and received a transcript of her statement to police before trial. In the statement, she told the police that she bought the gun off the street. She said she lied in the statement about where she got the gun in order to protect Cut because she was afraid of him. She acknowledged that in the statement, she told the police that she did not know what happened to the gun after the shooting. She said she was telling the truth because she gave the gun to Cut and did not know what he did with it. The Petitioner stated that even though the State could have cross-examined her about all of those things, she still had wanted to testify at trial. She acknowledged that co-counsel practiced cross-examination with her and that she considered the practice in deciding whether or not to testify.

Dr. Richard Adler, a clinical and forensic psychologist from Seattle, Washington, testified that FASD encompassed five different disorders, including FAS and Alcohol Related Neurodevelopmental Disorder (ARND), all of which "relate to the fact that alcohol is a particularly heinous poison to the developing fetus." Dr. Adler explained that the "primary disability" in FASD was damage to the baby's brain. As a person with FASD grew up, the person also experienced "secondary disabilities" such as having trouble with school, behavior, obtaining employment, and the law.

Dr. Adler testified that FASD became recognized in 1973 when studies showed that alcohol was "one of the worst poisons that is known to the developing fetus and it is a general poison meaning that it effects each and every cell." The brain was the organ most negatively affected. Eight years later, the United States Surgeon General began warning the public about the negative effects of alcohol on pregnancy. In 1996, when the Petitioner was eight years old, the Institute of Medicine authored a book on how to diagnose FASD, which was still being used at the time of the post-conviction evidentiary hearing. Dr. Adler said that an FASD diagnosis was based on a confirmed exposure to alcohol; facial anomalies, particularly small openings of the eyes, a flat philtrum, and a thinned upper lip; growth retardation; central nervous system (CNS) abnormalities that could be found from an MRI, CAT scan, Quantitative Electroenchephalogram (QEEG), or physical examination; cognitive or "thinking" abnormalities; and birth defects that could affect almost every organ in the body. Post-conviction counsel asked Dr. Adler how easy it was to diagnose a child with FASD. Dr. Adler answered that "sadly, it's not that easy" and that a study revealed only fifty percent of board certified pediatricians thought they were capable of diagnosing FASD.

Dr. Adler testified that in June 2011, he performed a physical examination of the Petitioner. He said that a second doctor performed neuropsychological testing and that a third doctor examined the Petitioner's historical background because "it does take multiple people working together to make the diagnosis." According to the Petitioner's biological mother, Georgiana Mitchell, Mitchell drank alcohol continually while she was pregnant with the Petitioner and could drink "up to a fifth or more a day." Regarding the Petitioner's facial deformities, she had a significantly flattened philtrum, which was the area between the bottom of the nose and the top of the upper lip, and the "suggestion" of a flattened mid-face. He noted that she also had clinodactyly, another very important finding associated with FASD, in that the third and fifth fingers of both hands were curved. Dr. Adler observed nystagmus, which was an abnormality of the CNS, and a QEEG showed abnormalities in the middle of the Petitioner's brain. As to the Petitioner's cognitive abnormalities, she had deficits associated with FASD in five areas: (1) visual/spatial planning, (2) impulsivity, (3) motor coordination, (4) receptive and expressive communication, and (5) adaptive functioning. He noted that she also had areas of impairment in social cognization, mathematics, verbal learning and memory, executive functioning, and personal hygiene and domestic skills. Based on all of the information gathered, Dr. Adler concluded that the Petitioner suffered from ARND.

Dr. Adler testified that the Petitioner had a "remarkable" I.Q. of 134 but that she did not function like a typical person with such high intelligence. He stated that "her functional abilities are terrible and they are so terrible they are equivalent to a person with mild mental retardation." He said that a common misconception was that having ARND was less serious than having FAS because people diagnosed with FAS had the "full face presentation" for FASD and an I.Q. ten points lower than a person diagnosed with ARND. He said having ARND was actually worse than FAS because individuals with ARND usually were not diagnosed until "one bad thing happens after the next." Thus, a person with FAS typically received a diagnosis and intervention before a person with ARND. Adults with ARND functioned like people with mild mental retardation. In 2011, the Vineland Adaptive Behavior Scales showed that the Petitioner was functioning like a thirteen- or fourteen-year-old.

Dr. Adler testified that he found evidence of childhood psychosis in the Petitioner's medical records. For example, during an episode at Middle Tennessee Mental Health Institute, the Petitioner had "appeared to be completely out of touch with reality." A test administered to the Petitioner the next day found that she "'might be becoming psychotic, but she is able to control her thoughts some of the time.'" He stated that in 2000, "among the diagnoses in her records was that she might have bipolar disorder with psychotic features or they were concerned about psychotic disorder not otherwise specified." He said that a test administered to the Petitioner in 2002 found her to have "dissociation, which is a very

primitive mental defense mechanism" and that dissociation was a "rare and worrisome psychiatric symptom."

Dr. Adler testified that ARND was a mental disease and defect, not a personality disorder, and that the Petitioner was "seriously impaired." The Petitioner was born with the disorder and was suffering from it when she shot the victim. He stated that the Petitioner had "baseline suspiciousness of others" and that her thinking "isn't particularly linear." Dr. Adler said that the Petitioner's testimony about being in the bedroom with the victim and not sure what he was doing was "pretty remarkable" in that "these particular psychological and psychiatric abnormalities that are in all likelihood directly related to Fetal Alcohol Spectrum Disorder were likely operative at least as she is reporting it and I heard it at the time of the subject offense."

On cross-examination, Dr. Adler acknowledged that he was retained by the Petitioner's post-conviction attorneys and was being paid for his work and appearance in court. He stated that he was going to be paid "in the 10 to $12,000 range up to this moment, some things haven't been billed yet" and that the amount did not include the work of his two colleagues. Dr. Adler said that although FASD was not specifically mentioned in the Diagnostic and Statistical Manual of Mental Disorders (DSM), "the negative affect of alcohol is mentioned in the section of mental retardation because fetal alcohol is the number one cause of mental retardation, so its in that section." His actual diagnosis of the Petitioner was "cognitive disorder not otherwise specified 294.9," which was in the DSM. Dr. Adler acknowledged that he never met or spoke with the Petitioner's biological mother and that he learned about her alcohol consumption from an affidavit in which she described the amount and frequency of her alcohol consumption during her pregnancy. He also acknowledged that the Petitioner received previous mental evaluations and was never diagnosed with FASD.

The State asked Dr. Adler if the Petitioner's drug use could have explained his findings, and he testified that her drug use would not have caused her abnormal facial features, clinodactyly, or nystagmus. He stated that he was not familiar with the facts of this case and that "my sole job in the diagnostic team is to make the diagnosis." He acknowledged that if he had testified at trial, the State could have asked him about the specific facts of the case and if those facts affected his diagnosis of the Petitioner.

Dr. Paul Connor, a clinical psychologist specializing in neuropsychology, the study of brain function, testified about his extensive background in fetal alcohol research. Dr. Connor performed a neuropsychological evaluation of the Petitioner in order to determine if her cognitive functioning was consistent with FASD. Using testing and guidelines established by the Centers for Disease Control (CDC), Dr. Connor looked for a pattern of strengths and weaknesses in different domains of the Petitioner's functioning. He explained

that a person's I.Q. was a very poor measure for FASD because "it is looking at only a small aspect of [a] person's functioning in real life and it's not an aspect that gets picked up very well for individuals with fetal alcohol." He stated that for normal people, "[t]hey'll do about as well on other tests as they will on an IQ test." However, people with FASD "will do worse and especially in the case when an IQ is very high that difference can be very profound even though it is not necessarily within the absolute impairment range."

Dr. Connor testified that the Petitioner's I.Q. was 134, meaning she was "very bright," and that in order to make a diagnosis of FASD, the CDC required three domains of deficit. The Petitioner's evaluation showed "absolute deficits" in five domains. First, she had deficits in visual/spatial understanding and reasoning, which was being able to take in complex information from the environment, reason through it, remember it, and reproduce it later. Second, she had deficits in motor coordination. Third, she had deficits in attention, particularly impulsivity. Dr. Connor observed that the Petitioner started tasks quickly, talked quickly, was "a little fidgety," and became distracted fairly easily. Fourth and fifth, the Petitioner had deficits in two areas of adaptive functioning: communication skills and socialization skills. Although the Petitioner was twenty-three years old, her adaptive functioning was that of a thirteen- to fourteen-year-old, and her adaptive functioning skills were at the level of a mentally retarded individual. Dr. Connor stated, "She has an IQ that is in the 130s. She is extremely bright from that perspective, but her ability to apply that appropriately independently on a day-to-day basis in the real world is profoundly impaired."

Dr. Connor testified that in regard to executive functioning, a sixth area of neuropsychological testing, the Petitioner's lower executive functioning was average. However, related to her I.Q., her lower executive functioning was moderately impaired and below her higher executive functioning skills. Dr. Connor explained that executive functioning in the laboratory was "as close as you get to the real world problem solving." He stated that the pattern of the Petitioner's test scores was "quintessentially the pattern that I would be expecting to see with fetal alcohol" and that, in comparison to the other cases he had seen over the years, the differences between her I.Q. and adaptive functioning abilities were "very profound."

Dr. Connor testified that in addition to the Petitioner's "absolute deficits," she also had relative deficits based on her I.Q. in social cognition, understanding social cues, mathematics, learning and memory, verbal learning and memory, executive functioning, and personal hygiene. Dr. Connor tested the Petitioner for malingering and found that she was "putting out very good effort." Moreover, a QEEG correlated with and confirmed his findings.

Dr. Natalie Novick Brown, a clinical and forensic psychologist, testified that she

began working in the area of FASD in the mid-1990's and regularly collaborated with Drs. Adler and Connor because "it's the standard of care in FASD assessment to have multi-disciplinary practitioners involved in the diagnosis." Dr. Connor's testing showed that the Petitioner's domains of deficit exceeded what was required for an FASD diagnosis, and Dr. Adler's diagnosis of ARND explained the test results and the Petitioner's life history. Dr. Brown's job was to determine whether anything in the Petitioner's life history contradicted the ARND diagnosis.

Dr. Brown testified that she evaluated the Petitioner in June 2011. The evaluation consisted of an interview, additional testing, and a review of all of the Petitioner's documented information, including her medical records, school records, juvenile court records, mental health institute records, and statement to police about the shooting. Dr. Brown explained that normal teenagers "do kind of crazy foolish bazaar things sometimes" because their "executive function processes are not fully formed yet and they are not thinking as efficiently as they ultimately will be when they reach their 20's." The brain of a typical sixteen-year-old was not fully developed and incapable of executive functioning at the level that society expected in terms of adult behavior. In children with FASD, that developmental process was even slower and could never reach the level of a normal person due to the underlying brain impairment. Dr. Brown stated that the Petitioner's executive functioning would not be fully mature until the Petitioner was in her early 30's. A QEEG showed "blue areas," areas of damage, in the frontal lobe of the Petitioner's brain. Other areas of damage extended beyond the frontal lobe.

Dr. Brown testified that in her opinion, the Petitioner's ability to make decisions correctly and know the consequences of those decisions was impaired. Dr. Brown reached that conclusion by assessing the Petitioner's suggestibility. The Petitioner's suggestibility score was relatively high, meaning she had a significant tendency to change her answers when pressured with admonishment by Dr. Brown and that she was susceptible or vulnerable to influence from stronger, more mature people. Dr. Brown said the Petitioner also had a high "confabulation" score, meaning she had a tendency to fill in information missing from her memory with information that made sense or seemed right to her. In the instant case, much of the Petitioner's version of the events was corroborated. However, information that was not corroborated may have been inaccurate. Testing also revealed that the Petitioner was prone to misinterpret verbal information during stressful situations. When the Petitioner was twenty-three years old, the Vineland assessments showed that her ability to understand verbal expressions was that of a ten-year-old. At the time of the shooting, she would have been functioning at an even lower level.

Dr. Brown testified that the Petitioner was very straightforward during her interview and did not attempt to under-report or hide information. A review of the Petitioner's school

records showed a severe discrepancy between her I.Q. and her behavior. By the fifth grade, the Petitioner's academic progress had started to decline, and she began showing difficulty in self-regulating her behavior. For example, when she was twelve years old, she and some other girls broke into a home and stole some jewelry. If the Petitioner's deficits had been recognized, she could have received treatment and therapies as a teenager "to train her cognitive processing so that the deficits would not be so apparent."

Dr. Brown testified that she found five records that referred to Georgina Mitchell's alcohol and drug use and that the records should have been a red flag for legal professionals because "that screams the potential for FASD." Dr. Brown said that the Petitioner's records were consistent with an ARND diagnosis and that in August 2004, the "severe mental defect and disease affected, influenced, impacted, impaired her ability to appreciate the nature of her, of her actions and also impaired her ability to control her behavior." The disorder also impaired the Petitioner's ability to appreciate the wrongfulness of her acts and affected her ability to form the requisite mental state. Dr. Brown noted that despite the Petitioner's high I.Q., she exhibited "foolish" behavior during the event by taking items from the victim's home that could be traced back to her, driving his truck, leaving his truck in a well-lit Walmart parking lot with cameras, telling Cut that she had killed someone, and using the victim's cellular telephone to call 911. Dr. Brown said that although the Petitioner had been on a cocaine "bender" for the two weeks leading up to the victim's death, her drug use did not explain her behavior.

On cross-examination, Dr. Brown testified that she could not say the Petitioner's cocaine use affected her judgment on the day of the shooting. She acknowledged that if she had testified at trial, the State could have cross-examined her about the Petitioner's escapes from custody and a detailed letter the Petitioner wrote from WMHI, asking someone to help her escape. Dr. Brown said the letter was not inconsistent with someone with FASD because writing it was "foolish" and "fits in" with the Petitioner's other foolish behaviors. Dr. Brown said that although the Petitioner was impulsive, she was not impulsive all of the time because impulsivity "will come out when something unusual or unexpected happens and she has to think quickly in the moment about how to respond." Dr. Brown acknowledged that the Petitioner told her adoptive mother that she "executed" the victim. Dr. Brown stated that the Petitioner may have heard the word from someone else or read it in the newspaper and that, even if she used the word deliberately, "her understanding of language [and] communication is impaired." Moreover, people with FASD tended to exhibit bravado. The evidence showed that the Petitioner gave inaccurate information about the shooting to the police and others. The Petitioner may have been trying to cover up what actually happened, or her tendency to confabulate may have caused her to fill in fabricated information. Although the Petitioner appeared to be lying, she was actually confabulating.

Dr. Brown acknowledged that the Petitioner had received "write-ups" in prison for misbehavior. Dr. Brown said that inmates with FASD were prone to infractions during early incarceration while they adjusted to prison and that the Petitioner received many of her write-ups "[p]articularly early." In the Petitioner's prior mental evaluations, she was not diagnosed with FASD but was diagnosed with many other disorders. Dr. Brown said that many of the symptoms associated with those disorders were also common in FASD and that the Petitioner was "manifesting symptoms that made it appear she was having each of those distinct disorders." Dr. Brown acknowledged that some of the Petitioner's behaviors associated with the shooting were not foolish. For example, the Petitioner gave the gun to Cut and wiped fingerprints off the victim's truck as Cut had instructed. Cut was murdered several months after the Petitioner's arrest and, therefore, was not available to contest anything she said.

On redirect examination, Dr. Brown testified that by not hearing about the Petitioner's FASD, the jury did not have "a clear picture" of the Petitioner or her mental state. Dr. Brown thought the Petitioner could function well in society and would be a low risk to reoffend if she lived in a structured environment and received support and treatment. On recross-examination, Dr. Brown acknowledged that extensive efforts were used to treat the Petitioner prior to the shooting and that the Petitioner was uncooperative. Dr. Brown said, however, that those treatments did not take into account the Petitioner's brain damage and that appropriate treatment would have generated a more cooperative patient.

Co-counsel testified for the State that he began practicing law in 1978, that he worked for the public defender's office from 1978 to 1983, and that 97 percent of his practice involved criminal law. Co-counsel began working on this case about the time of the Petitioner's arraignment in criminal court, and he familiarized himself with the case. Trial counsel filed pretrial motions, assessed the physical evidence, and hired an investigator. Co-counsel met with the Petitioner in jail many times. The Petitioner was very intelligent and nice, and co-counsel was never concerned that she did not understand the charges or the trial process.

Co-counsel testified that the Petitioner had received a mental evaluation when she was twelve years old and that trial counsel had her re-evaluated for this case. Dr. Bernet was hired to perform the evaluation and looked at two issues: whether the Petitioner waived her Miranda rights prior to giving her statement to police and her capacities at the time of the offenses. Trial counsel considered calling Dr. Bernet as a witness at trial and met with him to discuss his potential testimony. Dr. Bernet would have told the jury that the Petitioner had mental health issues, which was favorable to the defense. However, Dr. Bernet was aware of information that "painted her in a very negative light." Co-counsel acknowledged that Dr. Bernet knew about the Petitioner's negative behavior in custody, her prior record, and her drug use and stated that "so there is that balance of what do we get versus what the jury is

going to [hear] on, on a cross." Trial counsel talked with the Petitioner about whether she should testify. Co-counsel said that counsel may have told the Petitioner that the State could use her juvenile transfer hearing testimony to impeach her but that he did not remember making that statement to the Petitioner. Co-counsel said that this court had ruled that such testimony could not be used against a defendant at trial.

Co-counsel testified that he was concerned the Petitioner would "lose her cool" at trial because she was emotional at times and said things she did not mean. She also "got angry inappropriately." Co-counsel reviewed the Petitioner's juvenile hearing transcript and noticed a serious personality conflict between her and the prosecutor during cross-examination. Co-counsel acknowledged that a similar cross-examination at trial would have reflected negatively on the Petitioner. Trial counsel knew the State was going to use the Petitioner's statement at trial, so the defense was to argue self-defense without having the Petitioner testify. The Petitioner had read some law books and was convinced that a double jeopardy argument would result in the charges against her being dismissed. Although trial counsel did not think a legal basis supported the argument, they raised it for the Petitioner. The Petitioner's trial lasted five days.

On cross-examination, co-counsel acknowledged that the Petitioner's story about the shooting was compelling, consistent, and believable. However, co-counsel was concerned that if the Petitioner testified, she could "open the door to some lines of inquiry" by the State. Co-counsel instructed the Petitioner about how to behave during the trial, telling her not to respond to testimony by rolling her eyes, mumbling, or grumbling. He also told her to pay attention to her body language. Co-counsel described the Petitioner's behavior during the trial as "great."

Co-counsel testified that he read the Petitioner's records and talked about them with counsel. Trial counsel knew the Petitioner had mental health issues. However, they did not try to hire an expert in FASD. If trial counsel had known about the Petitioner's FASD, the information would have been helpful to her defense. Trial counsel would have included the Petitioner's impulsivity and her interpretation of the victim's conduct in the self-defense claim. Co-counsel acknowledged that an expert in FASD could have testified about the Petitioner's inability to understand what she was doing. He stated,

> I have always believed that if you have mental health testimony of some type of organic brain damage it can be very persuasive with the jury as distinguished from testimony that someone suffers from a personality disorder, my experience mainly in capital cases has been and certainly in sentencing phases, but that jurors consider defendants who have a damaged

-14-

brain differently than someone who had a rough childhood and
as a result has a personality disorder.

In a written order, the post-conviction court denied the petition for post-conviction relief. First, the court addressed the Petitioner's claim of newly discovered scientific evidence of her brain damage. The court found that the new evidence would have been relevant and admissible at trial. However, the court found that the Petitioner failed to establish "by clear and convincing evidence that no jury would have convicted her in light of the new evidence presented at the post-conviction hearing." The court acknowledged that the new evidence established the Petitioner had ARND at the time of the offenses but determined that the evidence was not "so compelling that no jury would have convicted her in light of it." Thus, the court concluded that the jury "reasonably could have found that the Petitioner's ARND did not impair her mental capacity to the extent that she could not form the requisite mental state for the charged offenses."

Regarding the Petitioner's claims of ineffective assistance of counsel, the post-conviction court found that trial counsel investigated the case very thoroughly, noticed the possibility of mental health issues, and referred the Petitioner to a psychiatrist. The court found that they were not deficient for failing to discover the Petitioner's ARND or second-guess Dr. Bernet's diagnosis. Regarding the Petitioner's claim that she received the ineffective assistance of counsel based on trial counsel's advice that she not testify at trial, the post-conviction court found that counsel and co-counsel advised the Petitioner on the "pros and cons" of testifying. The court recognized that part of the advice not to testify was based on counsel's misunderstanding of the law on the use of transfer hearing testimony at trial. However, the court noted that both attorneys also were concerned about the Petitioner's ability to stay calm on the witness stand. The post-conviction court found that it was the Petitioner's decision whether to testify and that she freely chose not to do so. The court also found that even if trial counsel were deficient, the Petitioner failed to demonstrate prejudice because the "substance" of her testimony was contained in her statement to police; therefore, the jury heard the Petitioner's story without the Petitioner's experiencing cross-examination. Furthermore, the Petitioner's testimony at the evidentiary hearing did not substantially rebut the State's allegations.

Finally, the post-conviction court addressed the constitutionality of the Petitioner's sentence. The court noted that the United States Supreme Court had recently ruled in Miller v. Alabama, 132 S. Ct. 2455, 2469 (2012), that the Eighth Amendment prohibited a sentencing scheme that mandated a sentence of life without the possibility of parole for juvenile offenders. However, the court stated that the Petitioner's life sentence, which included the possibility of parole, did not "run afoul of any precedent" and concluded that nothing about her sentence was unconstitutional. Thus, the post-conviction court denied

-15-

relief.

## II.  Analysis

### A.  Ineffective Assistance of Counsel

The Petitioner claims that she is entitled to post-conviction relief because trial counsel were ineffective for giving her erroneous legal advice that resulted in her decision not to testify at trial; for failing to interview or investigate her biological mother; and by failing to investigate the case adequately, which resulted in their failing to present a defense based upon her severe mental disease and defect.  The State argues that the Petitioner has not shown that she received the ineffective assistance of trial counsel.  We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove factual allegations contained in the post-conviction petition by clear and convincing evidence.  See Tenn. Code Ann. § 40-30-110(f).  "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'"  State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).  Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact.  See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact.  See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.  However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

> no particular set of detailed rules of counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

The Petitioner contends that trial counsel rendered deficient performance because counsel erroneously told her that the State could use her transfer hearing testimony to impeach her at trial. She contends that counsel's deficient performance resulted in her decision not to testify and that she was prejudiced by the deficiency because her self-defense story was compelling and believable and her testimony was the only way she could show the jury her "abusive domination by Cut Throat" and the victim's "'dark side.'"

Granted, counsel testified that she incorrectly told the Petitioner that the Petitioner's transfer hearing testimony could be used against the Petitioner at trial. See Tenn. Code Ann. § 37-1-134(f)(1) (providing that"[s]tatements made by the child at the juvenile court hearing under this section are not admissible against the child, over objection, in the criminal proceedings following the transfer); State v. Robert Blocker, No.

E1999-01624-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 452, at **17-18 (Knoxville, June 5, 2000) (noting no exception in the statute for the use of a juvenile's transfer hearing testimony to impeach the juvenile defendant at trial). However, as noted by the post-conviction court, trial counsel also did not want the Petitioner to testify because they were concerned she would be unable to control her temper on the witness stand. At the evidentiary hearing, counsel testified that the Petitioner had lost her temper in meetings with trial counsel. The Petitioner testified that counsel warned her about having outbursts at trial and that the advice was probably based on "some issues that I had had before." We note that both attorneys also based their advice on problems the Petitioner experienced during her testimony at the juvenile transfer hearing.

The Petitioner contends that this case is similar to State v. Zimmerman, 823 S.W.2d 220, 226-28 (Tenn. Crim. App. 1991), in which this court held that the defendant, who claimed that she killed her husband in self-defense, received the ineffective assistance of counsel because trial counsel advised her not to testify. The instant case, though, is quite distinguishable from Zimmerman. In Zimmerman, defense counsel announced to the jury during opening statements that, in accordance with trial strategy, the defendant and the psychologist who had treated her for battered wife syndrome would testify. 823 S.W.2d at 221-22. During the State's case-in-chief, the State introduced portions of the defendant's pretrial statement into evidence. Id. at 222. After the State rested, one of the defendant's attorneys advised her not to testify and to "'shut down' the case." Id. at 222, 224-25. The defense did not present any witnesses or evidence on the defendant's behalf. Id. at 226. The jury convicted her as charged of second degree murder. See id. at 224.

On appeal, this court granted post-conviction relief, stating that "nothing changed during the course of the trial. . . . In other words, there appears to have been no basis for the sudden change in strategy." Id. at 226. This court went on to cite the following five factors which "would tend to indicate ineffective assistance" in a case where defense counsel fails to call the defendant to testify:

> (1) only the victim and the defendant were present when the offense was committed;
>
> (2) only the defendant could present a "full version of her theory of the facts";
>
> (3) the defendant's testimony could not be impeached by prior criminal convictions;
>
> (4) the defendant could give an account of the relationship with

the victim; and

> (5) the attorney had let in objectionable, prejudicial testimony
> with the intention of clarifying it with the testimony of the
> defendant.

Id. at 227 (quoting from State v. Dorothy Renate Gfeller, No. 87-59-III, 1987 Tenn. Crim. App. LEXIS 2652, at *12 (Nashville, July 24, 1987)).

The first four factors are present in the instant case. On the other hand, unlike Zimmerman, the Petitioner does not allege that trial counsel made promises to the jury about her testimony. Moreover, trial counsel, based on a legitimate concern that the Petitioner's behavior on the stand would hurt her case, recommended before trial that she not testify. Although the Petitioner had no prior convictions that could have been used to impeach her, the Petitioner acknowledged that her statement was not entirely truthful, and the State could have questioned her about the statement and impeached her with parts of it that were inconsistent with her trial testimony. Additionally, trial counsel were concerned that the jury would learn during cross-examination about the Petitioner's juvenile record and infractions in confinement. Furthermore, they were still able to present her self-defense claim through her statement to police, and they did not abandon the theory of defense mid-trial. Finally, in Zimmerman, this court was particularly concerned that defense counsel failed to present any witnesses or evidence on the defendant's behalf despite the existence of evidence that could have helped her case. See id. In the instant case, though, trial counsel presented two witnesses for the Petitioner, one of whom testified that the victim took her to his house and sexually assaulted her in 2004. See Cyntoia Denise Brown, No. M2007-00427-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 301, at **33-34. Therefore, we agree with the post-conviction court that the Petitioner has failed to show that trial counsel was ineffective for advising her not to testify at trial.

Next, the Petitioner contends that she received the ineffective assistance of counsel because trial counsel failed to investigate and interview her biological mother, Georgina Mitchell, when counsel knew from the Petitioner's records that she had lived with Mitchell off and on until she was two years old, that Mitchell kidnapped her when she was eighteen months old, that Mitchell had been in and out of prison, that Mitchell was only sixteen years old when the Petitioner was born, and that Mitchell had a history of drug and alcohol abuse. However, the Petitioner did not raise this issue in either of her petitions for post-conviction relief, and post-conviction counsel never questioned trial counsel about the issue. As a result, the post-conviction court did not address the issue in its order denying the petition. Therefore, the issue is waived. See Tenn. Code Ann. § 40-30-106(g) (providing that a ground for post-conviction relief is waived "if the petitioner personally or through an

attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented").

The Petitioner contends that she received the ineffective assistance of counsel because trial counsel did not investigate her case adequately, which resulted in their failing to present a diminished capacity defense based upon her severe mental disease and defect, ARND. However, a reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 Tenn. Crim. App. LEXIS 524, at *134 (Jackson, July 1, 2009), perm. to appeal denied, (Tenn. 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. at **134-35. The United States Supreme Court has said that "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

The post-conviction court found that trial counsel investigated the case very thoroughly, noticed the possibility of mental health issues, and referred the Petitioner to Dr. Bernet. Dr. Bernet evaluated the Petitioner and diagnosed her with a personality disorder. At the evidentiary hearing, Dr. Adler indicated that diagnosing a child with FASD was difficult, and Dr. Brown acknowledged that the Petitioner previously had been diagnosed with many disorders. She stated that many of the symptoms associated with those disorders also were common in FASD and that the Petitioner was "manifesting symptoms that made it appear she was having each of those distinct disorders." As this court has stated, "[A] defense attorney 'is not required to question a diagnosis put forth by a professional expert in the field.'" Robert Faulkner v. State, No. W2012-00612-CCA-R3-PD, 2014 Tenn. Crim. App. LEXIS 855, at *250 (Nashville, Aug. 29, 2014) (quoting Christa Gail Pike v. State, No. E2009-00016-CCA-R3-PD, 2011 Tenn. Crim. App. LEXIS 285, at *154 (Knoxville, Apr. 25, 2011)). Therefore, the evidence does not preponderate against the post-conviction court's finding that trial counsel were not deficient for failing to discover the Petitioner's FASD/ARND or second-guess Dr. Bernet's diagnosis. In sum, we agree with the post-conviction court that the Petitioner has failed to show that she received the ineffective assistance of counsel.

B. Newly Discovered Scientific Evidence

The Petitioner claims that the post-conviction court erred by failing to grant post-conviction relief when newly discovered "medical and scientific evidence" proves she was mentally incapable of committing the offenses and that such evidence clearly entitles her to relief pursuant to Tennessee Code Annotated section 40-26-105, the statute providing for a

procedural remedy through a writ of error coram nobis. The State argues that the post-conviction court properly denied post-conviction relief because the Petitioner failed to show she was "actually innocent" of the offenses and that she has waived any claim pursuant to a writ of error coram nobis. We agree with the State.

1. Post-Conviction Relief

"Relief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. In order to obtain relief,

> a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken, or if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred.

Tenn. Code Ann. § 40-30-102(a). If the one-year time period has expired, Tennessee Code Annotated section 40-30-102(b)(2) provides a method by which courts may address a petitioner's claim of being "actually innocent" of the crime based upon newly discovered scientific evidence. In State v. Dellinger, 279 S.W.3d 282, 295 (Tenn. 2009), our supreme court held that a freestanding claim of actual innocence based on new scientific evidence also is cognizable in an initial, timely-filed petition for post-conviction relief. To show that a petitioner is actually innocent of the crime, the petitioner "must establish by clear and convincing evidence that no jury would have convicted him [or her] in light of the new evidence.'" David Ivy v. State, No. W2010-01844-CCA-R3-PD, 2012 Tenn. Crim. App. LEXIS 1070, at *79 (Jackson, Dec. 21, 2012), perm. to appeal denied, (Tenn. 2013) (quoting Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 Tenn. Crim. App. LEXIS 524, at *97 (Jackson, July 1, 2009), perm. to appeal denied, (Tenn. 2009)).

The Petitioner contends,

> The heightened burden of proving 'actual innocence' is not found anywhere in the Post-Conviction Procedure Act involving a timely filed, initial petition. . . . Thus, it would follow that the standard to be applied is that consistently applied in cases of ineffective assistance of counsel, i.e., whether there is 'any reasonable probability that the result of the trial would have

-21-

been different.'"

However, Dellinger demonstrates that claims for post-conviction relief based on newly discovered scientific evidence, whether raised in a timely or untimely petition for post-conviction, must include a claim of actual innocence. Furthermore, in our view, the applicable standard of review in such cases remains the standard announced by this court in David Ivy and Perry Anthony Cribbs.

The Petitioner also contends that even under the "'actual innocence' standard," she has shown that she is actually innocent of the crimes because she was unable to form the required mental state. The post-conviction court concluded that the Petitioner suffered from ARND, and the evidence does not preponderate against that finding. However, in order to show that she is entitled to relief based upon actual innocence, the Petitioner had to establish by clear and convincing evidence that no jury would have convicted her in light of the new evidence. We agree with the post-conviction court that the new evidence fails to establish the Petitioner's actual innocence.

2. Coram Nobis Relief

As to her claim for coram nobis relief, the State argues that the Petitioner has waived the issue because she failed to file a petition for a writ of error coram nobis in the lower court. In support of its argument, the State notes that the Petitioner filed a pro se petition for post-conviction relief, an amended petition for post-conviction relief, and a post-hearing memorandum in support of her post-conviction petition but never filed a petition for writ of error coram nobis. The Petitioner replies that after her post-conviction counsel learned that she suffered from ARND, they amended and supplemented her pro se petition to include "the clearly stated assertion in the court below that Petitioner was seeking relief under both avenues of procedural redress, post conviction and coram nobis." We disagree with the Petitioner.

The writ of error coram nobis is a post-conviction mechanism that has a long history in the common law and the State of Tennessee. See, e.g., State v. Vasques, 221 S.W.3d 514, 524-26 (Tenn. 2007). Currently, the writ is codified as follows in Tennessee Code Annotated section 40-26-105(b):

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the

defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

The writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999).

Our supreme court has stated that when examining a petition for writ of error coram nobis, a trial court is to

first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

Vasques, 221 S.W.3d at 527. In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceeding might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1100, at **36-37 (Nashville, Oct. 7, 2005)). A decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010).

The Petitioner's pro se petition for post-conviction relief contained a brief section titled "NEWLY DISCOVERED EVIDENCE" in which she stated that a video documentary about her and filmed by Dan Birman "suggested" that FAS "played a part in [her] actions on the night in question." The Petitioner's amended petition for post-conviction relief alleged that counsel was ineffective for failing to investigate and present evidence of her FASD; it did not mention a claim of newly discovered evidence. A document filed by the Petitioner after the evidentiary hearing and titled "PETITIONER CYNTOIA BROWN'S MEMORANDUM AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HER REQUEST FOR POST CONVICTION RELIEF" asserted that "newly discovered scientific/medical evidence has been discovered and secured which negates her guilt of premeditated murder, felony murder and aggravated robbery." However,

in the memorandum, the Petitioner cited only post-conviction statutes and cases. Moreover, the Petitioner argued in the memorandum that she proved her claim by clear and convincing evidence, the standard required to obtain post-conviction relief.

Counsel never mentioned "error coram nobis" at the post-conviction evidentiary hearing. In fact, the first time "error coram nobis" appears anywhere in the record before us is in the Petitioner's appellate brief. Not surprisingly, the State did not respond to an error coram nobis claim at the evidentiary hearing, and the post-conviction court did not address an error coram nobis claim or state the coram nobis standard of review of "whether the new evidence may have led to a different result" in its order denying relief. Therefore, we conclude that the issue of coram nobis relief was not raised in the court below.

Moreover, we will not treat the petition for post-conviction relief as one requesting relief under the writ of error coram nobis. See Asata Lowe v. State, No. E2006-02028-CCA-MR3-PC, 2008 Tenn. Crim. App. LEXIS 176, at **65-66 (Knoxville, Mar. 10, 2008), perm. to appeal denied, (Tenn. 2008) (concluding that this court may not treat a petition for post-conviction relief as one requesting relief under the writ of error coram nobis); see also Harris v. State, 102 S.W.3d 587, 591-594 (Tenn. 2003) (stating that "it will rarely, if ever, be appropriate for an appellate court to sua sponte treat a [petition for post-conviction relief] as a petition for writ of error coram nobis" because doing so deprives the State of an opportunity to file an appropriate response in the trial court and deprives the trial court of the opportunity to determine the merits of the petition"). Therefore, the Petitioner is not entitled to relief.

## C. Life Sentence

Next, the Petitioner contends that her automatic life sentence constitutes cruel and unusual punishment because she will not be eligible for parole for fifty-one years and, therefore, will serve a longer term of incarceration than an adult defendant who receives a life sentence. She also argues that a trial court must be allowed to exercise judgment and discretion in sentencing juvenile defendants so that the court can consider factors such as the defendant's youth and mental capacity. Again, we conclude that the Petitioner is not entitled to relief.

In support of her argument, the Petitioner relies on various cases which she says "teach that sentences and criminal process must be made proportionate to the level of maturity and culpability of the defendant." However, the Petitioner has failed to cite any mandatory authority in which a court has held that a juvenile defendant's life sentence was unconstitutional. Instead, she cites Miller v. Alabama, 132 S. Ct. 2394 (2012), in which the United States Supreme Court held that a mandatory sentence of life without the possibility

of parole for juvenile offenders violated the United States Constitution's Eighth Amendment prohibition against cruel and unusual punishment. As the post-conviction court noted, though, life without the possibility of parole is not the sentence at issue here.

The Petitioner also cites State v. Andre Jerome Lyle Jr., in which the Iowa Supreme Court recently held that all mandatory sentences involving juveniles, even short sentences, violated the state constitution. ___ N.W.2d ___, No. 11-1339, 2014 Iowa Sup. LEXIS 84, at *58 (July 18, 2014). However, Lyle constitutes persuasive, non-binding authority, and panels of this court have refused to expand the holding in Miller to life sentences for juveniles, let alone sentences involving less than life. See Floyd Lee Perry, Jr., v. State, No. W2013-00901-CCA-R3-PC, 2014 Tenn. Crim. App. LEXIS 327, at *15 (Jackson, Apr. 7, 2014) (noting a split of authority regarding the retroactive application of Miller and refusing to expand Miller to the petitioner's life sentence). Therefore, the post-conviction court properly denied relief on this issue.

### D. Due Process

Finally, the Petitioner contends that she was denied due process because "[t]hrough no fault of her own, [her] severe mental disease and defect, ARND, was not discovered until after her conviction, sentence and all appeals were exhausted. Thus, her right to present a meaningful defense at a meaningful time was denied." However, the post-conviction court ruled that the Petitioner did not receive the ineffective assistance of counsel, that she was not entitled to post-conviction relief based upon her claim of newly discovered scientific evidence, and that her sentence was not unconstitutional, and we have affirmed the rulings of the post-conviction court. Therefore, we conclude that the Petitioner has not established by clear and convincing evidence that her due process rights were violated.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
NORMA McGEE OGLE, JUDGE